## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____  )
                                )
DAVID SICKLE, et. al.,          )
                                )
            Plaintiffs,         )
    v.                          )          Civil Action No. 11-2224 (KBJ)
                                )
TORRES ADVANCED ENTERPRISE      )
SOLUTIONS, LLC, et. al.,        )
                                )
            Defendants.         )
_____  )
```

### <u>MEMORANDUM OPINION</u>

Plaintiffs David Sickle and Matthew Elliott ("Plaintiffs") are military sub-contractors who formerly maintained a sub-contractor relationship with defense contractor Torres Advanced Enterprise Solutions, LLC ("Torres AES"). Plaintiffs allege that Torres AES and Scott Torres—whom Plaintiffs characterize as a "principal and owner" of Torres AES (2d Am. Compl., ECF No. 26, ¶ 4) (collectively, "Defendants")—conspired to terminate Plaintiffs' relationship with Torres AES improperly and in retaliation for Elliott's having sought workers' compensation benefits under the Defense Base Act ("DBA"), 42 U.S.C. §§ 1651–55. (*See* 2d Am. Compl., ¶¶ 2, 4.) This Court dismissed Plaintiffs' initial complaint in its entirety on exhaustion and preemption grounds, *see Sickle v. Torres Advanced Enter. Sols., LLC*, 17 F. Supp. 3d 10, 21, 22 (D.D.C. 2013); however the D.C. Circuit partially reversed that ruling, *see Sickle v. Torres Advanced Enter. Sols., LLC ("Sickle II")*, 884 F.3d 338, 344 (D.C. Cir. 2018) (holding that Elliott's contract claim and Sickle's tort and contract claims were not preempted). On remand, Plaintiffs have filed a Second Amended Complaint that

repleads the claims that the Circuit panel reinstated: both Plaintiffs allege that Torres AES breached their respective contracts when it terminated their employment without proper notice (*see* 2d Am. Compl. ¶¶ 30–31), and Sickle also claims that Defendants are liable for common law retaliatory discharge, conspiracy, and prima facie tort arising from the termination of his contract (*see id.* ¶¶ 21–28, 37–45).

Before this Court at present is Defendants' motion to dismiss Plaintiffs' Second Amended Complaint.  (*See* Defs.' Mot. to Dismiss Pls.' 2d Am. Compl. ("Defs.' Mot."), ECF No. 27.)  Defendants argue that this Court lacks personal jurisdiction over Scott Torres (*see* Mem. of Law in Supp. of Defs.' Mot. ("Defs.' Mem."), ECF No. 27-1, at 15–22), and they further insist that Sickle has failed to plead a plausible claim for retaliatory discharge (*see id.* at 23–30), and that the amended complaint's conspiracy and prima facie tort claims are implausible (*see id.* at 34–36).[1]  With respect to the breach of contract claims, Defendants assert that the claims for breach of the covenant of good faith and fair dealing must be dismissed because the governing law does not recognize that cause of action (*see id.* at 30–33), and that, while Plaintiffs have stated plausible claims for general breach of contract against Torres AES, the recoverable amounts in controversy with respect to those claims fall below the $75,000 threshold for federal court jurisdiction (*see id.* at 33).

For the reasons explained below, this Court finds that Defendants' motion to dismiss must be **GRANTED IN PART and DENIED IN PART**.  The motion will be granted with respect to all of the claims filed against Scott Torres, because the Court lacks personal jurisdiction over that defendant, and the motion will also be granted with

---

[1]  Page number citations to the documents that the parties have filed refer to the numbers automatically assigned by the Court's electronic case filing system.

respect to Plaintiffs' claims for retaliatory discharge, conspiracy, prima facie tort, and breach of the covenant of good faith and fair dealing—none of which are cognizable under Virginia law (which the Court concludes is applicable to the claims made in the instant lawsuit).  Defendants' motion to dismiss will be denied with respect to the remaining breach of contract claims, however, because, given the lack of information in the contracts concerning how damages are to be calculated in the event of a breach, it is not implausible that Plaintiffs' damages for Torres AES's failure to provide the requisite notice exceed the $75,000 threshold.  A separate Order consistent with this Memorandum Opinion will follow.

I.      **BACKGROUND**

   A.      **Factual Background[2]**

      Torres AES contracts with the Department of Defense, the Department of State, and Sabre Security International (another defense contractor) to provide security and other services at United States military installations abroad.  (*See* 2d Am. Compl. ¶ 4.) Torres AES is a Virginia limited liability company, and it maintains its principal place of business in Falls Church, Virginia.  (*See id*. ¶ 3.)  Scott Torres avers that he is a resident of Kansas who worked for Torres AES from 2006 until February of 2018.  (*See* Decl. of Scott Torres, Ex. A to Defs.' Mot., ECF No. 27-2, ¶¶ 2, 4.)  He further avers that he occupied various positions while with Torres AES, including pricing analyst,

---

[2]  The background facts that are recited in this Memorandum Opinion are drawn from the allegations in Plaintiffs' complaint, which must be accepted as true at this stage in the litigation.  *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).  The facts regarding the extent and nature of Scott Torres's contacts with the District of Columbia, which are relevant to this Court's analysis of personal jurisdiction, are undisputed, and are taken from the affidavit that he has submitted.  *See Xie v. Sklover & Co., LLC*, 260 F. Supp. 3d 30, 37 (D.D.C. 2017) (explaining that a court may consider evidence from affidavits in resolving a motion to dismiss for lack of personal jurisdiction).

project manager, project coordinator, and program and security contracts manager.  (*See id.* ¶ 5.)

According to the operative complaint, Torres AES first hired Sickle in 2009, to work as a medic at Forward Operating Base Shield ("FOB Shield") in Iraq; and Sickle and Torres AES executed the one-year contract that is at issue in this case on June 1, 2010.  (*See* 2d Am. Compl. ¶ 6.)  The express terms of the contract permitted "[e]ither party" to terminate the agreement "for a material breach . . . effective upon receipt of thirty (30) days written notice if the Cause remains uncured."  (Ex. C to 2d. Am. Compl. ("Sickle Contract"), ECF No. 26-3, ¶ 7.2.)  In addition, the contract vested "[e]ither Party" with the authority to "terminate this Subcontracting Agreement without Cause effective upon 28 days of receipt of written notice."  (*Id.*)  The contract further specified the form that any such notice of termination must take—namely, it must be "in writing and . . . personally delivered, delivered by overnight mail, or mailed, by certified mail-return receipt requested."  (*Id.* ¶ 8.2.)  The contract also contained the following choice-of-law provision: "[t]his Agreement, including all matters related to construction, performance and enforcement, shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without reference to conflicts of law principles[.]"  (*Id.* ¶ 8.5.)

Torres AES separately contracted with Elliott to work at FOB Shield as a kennel master, managing trained dogs used by the military in Iraq.  (*See* 2d Am. Compl. ¶ 7.)  Elliot's contract term was approximately eleven months—from mid-February of 2010, through December 31, 2010.  ( *See id.*)  The written agreement between Torres AES and Elliot contained the same language as Sickle's contract regarding the ability of "[e]ither

party" to terminate the agreement "for a material breach . . . effective upon receipt of thirty (30) days written notice if the Cause remains uncured" (Ex. B to 2d. Am. Compl. ("Elliott Contract"), ECF No. 26-3, ¶ 7.2), and it also contained the same requirement regarding the form of the notice and its delivery (*id.* ¶ 8.2), and the same Virginia choice-of-law provision (*id.* ¶ 8.5).  With respect to termination without cause, Elliott's agreement specifically authorized Elliott (alone) to "terminate this Subcontract Agreement without cause effective upon 28 days of receipt of written notice."  (*Id.* ¶ 7.2.)

On March 15, 2010, Elliott allegedly injured his back while stacking sandbags at FOB Shield.  (*See* 2d Am. Compl. ¶¶ 9–10.)  According to the Second Amended Complaint, Sickle witnessed this injury, and "determined [Elliott] had likely herniated a dis[c]."  (*Id.* ¶ 9.)  Sickle gave Elliott an initial injection of medication and then treated him with oral pain medication for three weeks, before ultimately recommending that Elliott undergo an MRI and "be followed by the [Department of Labor, Office of Workers' Compensation Programs] for care[,]" pursuant to the DBA.  (Ex. A. to 2d Am. Compl., ECF No. 26-1, at 2 (emphasis omitted).)  Sickle documented his care of Elliott and his treatment recommendations in an undated report (*see id.*), and Elliott subsequently applied for DBA benefits relating to this injury, submitting Sickle's report in support of his DBA claim (*see* 2d Am. Coml. ¶¶ 13, 15).

On April 30, 2010, Elliott took leave and traveled "home" to Wisconsin, intending to have his back evaluated before returning to Iraq on May 16, 2010.  (*Id.* ¶¶ 3, 16).  According to the Second Amended Complaint, "[p]rior to [Elliott's] return, and with knowledge of his DBA injury claim, Mr. Scott Torres on May 9, 2010[,] in an

email discharged Mr. Elliott without any notice." (*Id.*)  The pleading further alleges that Elliott's DBA claim for disability benefits was denied at an unspecified point in this same time frame.  (*See id.* ¶ 13.)  Elliott then hired legal counsel in Washington, D.C. to assist with challenging the decision concerning his DBA claim.  (*See id.* ¶¶ 13–16.)

With respect to Elliott's DBA benefits claim, Plaintiffs allege that "both Torres Defendants made representations to insurance company representatives that were sent to the District of Columbia concerning Torres [D]efendants' claims that Mr. Elliott was terminated and the reasons for that termination with knowledge that such would be made to the District of Columbia." (*Id.* ¶ 16; *see also id.* ¶ 17 (claiming that "[c]ounsel for Torres AES represented that Mr. Elliott was terminated for filing a false claim for injury").)  The initial denial of DBA benefits was subsequently reversed, and Elliott "began to receive medical benefits, treatment and bi-weekly temporary total disability benefits, and also received an MRI showing a herniated disc and received back surgery paid for by the insurance carrier on July 7, 2010." (*Id.* ¶ 13.)

Concerning Sickle, Plaintiffs allege that "[a]t the same time that Mr. Elliott was receiving his DBA benefits, Mr. Sickle received a one year contract with Torres from June 1, 2010 until June 1, 2011 to continue as medical officer at FOB Shield" (*id.* ¶ 14), but by the end of June 2010, Torres AES and Scott Torres were allegedly upset with Sickle for drafting the medical report that Elliott had used to support his claim for DBA benefits, because they believed that Elliott had "faked his injury" (*id.* ¶ 15).  Plaintiffs allege that, as a result, "Torres officers and agents began to intimidate and threaten Mr. Sickle" in Iraq, and when Sickle refused to withdraw his report, Torres AES "sen[t] him

home for 30 days to 'think things over,'" which Sickle took to mean that he had to recant his report in order to continue his contract. (*Id.*) While Sickle was at home in North Carolina, and after he once again refused to withdraw his report regarding Elliott's injury, Scott Torres allegedly terminated Sickle by e-mail and with no notice. (*Id.* ¶¶ 3, 15; *see also id.* ¶ 17 (alleging that Defendants "expressed great hostility to and animus toward the claim for compensation and acted with great anger toward both Elliott and Sickle regarding their alleged falsification of the workers compensation claim and Sickle's support of it").)

### B.    Procedural History

Plaintiffs initiated this litigation against Torres AES and Scott Torres on December 14, 2011 (*see* ECF No. 1), and filed their first amended complaint on April 9, 2012.  That pleadings contained four counts:  (1) discrimination and retaliatory discharge in violation of the DBA (Count I); (2) breach of contract and the covenant of good faith and fair dealing (Count II); (3) common law retaliatory discharge for the filing of a worker's compensation claim (Count III), and (4) conspiracy and prima facie tort for allegedly conspiring to commit the acts alleged in the amended complaint (Count IV).  (*See* 1st Am. Compl. ¶¶ 20–43.)  Defendants filed a motion seeking dismissal of Plaintiffs' amended complaint (*see* ECF No. 10), and this Court granted that motion on December 24, 2013, finding that Plaintiffs had failed to exhaust their administrative remedies with respect to their claims under the DBA brought in Count I, and also that the DBA preempted the contract and tort claims that Plaintiffs asserted in Counts II, III, and IV, *see Sickle*, 17 F. Supp. 3d at 21–22.

On appeal, the D.C. Circuit affirmed this Court's dismissal of Plaintiffs' DBA retaliation claims for failure to exhaust.  *See Sickle v. Torres Advanced Enter. Sols.,*

*LLC ("Sickle I")*, 653 F. App'x. 763, 763 (D.C. Cir. 2016).  It likewise upheld this Court's dismissal of Elliott's tort claims based on DBA preemption, finding that any such claims "are squarely foreclosed because they arise directly out of his own application for workers' compensation benefits."  *See Sickle II*, 884 F.3d at 344.  But, the Circuit reversed the dismissal of Elliott's contract claim and Sickle's tort and contract claims, *see id.*, finding that Sickle's tort claims were not preempted because they arose "independently of an entitlement to benefits" under the DBA, *id.* at 349; *see also id.* (explaining that Sickle was not seeking benefits under the DBA, and his termination was not "'because he has testified or is about to testify in a proceeding under this chapter[,]'" but because "he truthfully documented Elliott's medical injuries" (quoting 33 U.S.C. § 948a)).  And with respect to Plaintiffs' contract claims, the Circuit panel found that "[t]he only issue raised by the contract claims is whether Torres provided the required advance notice of termination," *id.* at 350, and the DBA imposed no preemptive bar on those claims given that "resolution of that specific question has no bearing on either Elliott's or Sickle's entitlement to or recovery of workers compensation benefits" under the DBA, *id.*  The D.C. Circuit also assumed that it had personal jurisdiction over Scott Torres "for purposes of this appeal[.]"  *Id.* at 344.

On July 9, 2018, following the D.C. Circuit's remand of the case to this Court, Plaintiffs filed their Second Amended Complaint, which contains three counts.  Count I, for common law retaliatory discharge, is brought by Sickle alone (*see* 2d Am. Compl. ¶¶ 20–28); Count II, for breach of contract and breach of the covenant of good faith and fair dealing, is brought by both Sickle and Elliott (*see id.* ¶¶ 29–35); and Sickle alone

presses Count III, which alleges conspiracy and prima facie tort (*see id.* ¶¶ 36–45).[3]
Defendants moved to dismiss Plaintiffs' complaint in its entirety on July 23, 2018.  (*See*
Defs.' Mot.)

Defendants' motion argues, first, that all claims against Scott Torres must be
dismissed because this Court lacks either general or specific personal jurisdiction over
him.  (*See* Defs.' Mem. at 15–22.)  Then, with respect to Sickle's tort claim for
retaliatory discharge (Count I), Defendants assert that such a claim is not plausible
under the laws of either the District of Columbia or Virginia, because Sickle was an
independent contractor and not an employee and, in any event, he has not properly
alleged a public policy on which such a claim can be predicated.  (*See id.* at 23–30.)
Defendants further maintain that the recoverable amounts in controversy with respect to
the breach of contract claims against Torres AES (Count II) fall below the $75,000
jurisdictional threshold for federal court (*see id.* at 33), and that the similar claims for
breach of the covenant of good faith and fair dealing must be dismissed because
Virginia law—which Defendants say governs each of the employment agreements—
does not recognize this cause of action under the circumstances of this case (*see id.* at
30–33).[4]  Defendants also argue that Sickle's claims for civil conspiracy and prima
facie tort (Count III) fail under both D.C. and Virginia law, because he does not specify

---

[3]  The Complaint appears to assert Count III on behalf of both Sickle and Elliott, but Plaintiffs have
since clarified that this claim "rest[s] with [Plaintiff] Sickle only."  (Pls.' Mem. in Resp. to Court's
Questions on Venue and Choice of Law Issues ("Pls.' Suppl. Mem."), ECF No. 31, at 19.)

[4]  While the complaint appears to bring contract claims against both Torres AES and Scott Torres
individually, Plaintiffs have clarified in their opposition brief that they are not bringing any such claim
against Scott Torres, explaining that "[t]here is no claim that Plaintiffs have a written contract with
Scott Torres."  (Pls.' Mem. in Supp. of Opp'n to Defs.' Mot. ("Pls.' Opp'n"), ECF No. 28-1, at 42.)

the underlying tort on which he predicates his claim, and neither D.C. nor Virginia recognizes prima facie tort as an independent cause of action. (*See id.* at 34–36.)

Plaintiffs oppose Defendants' motion to dismiss, insisting that this Court has personal jurisdiction over Scott Torres because he "transacted business in the District of Columbia as an agent of Torres AES" based on the company's various contracts with the federal government, which resulted in "revenue . . . from funds appropriated in the District of Columbia[.]" (Pls.' Opp'n at 16; *see also id.* at 17 (claiming that Scott Torres "contracted to supply services in the District of Columbia").) Plaintiffs further claim that "Scott Torres caused tortuous [sic] injury in the District through his accusations . . . that Plaintiffs falsified [Elliott's] injury" (*id.* at 17), and that he allegedly made false statements regarding Elliott's injury and DBA benefits claim to both Plaintiffs' counsel in the District and insurance company representatives who then transmitted those alleged falsehoods to the Department of Labor (*see id.* at 16, 18). Plaintiffs further insist that Scott Torres has waived any personal jurisdiction argument because Defendants did not raise any personal jurisdiction problem when the matter was on appeal, and the D.C. Circuit did not find any such jurisdictional defect. (*See id.* at 21.)

With respect to Sickle's claims for retaliatory termination in violation of public policy, Plaintiff's opposition brief asserts that Sickle was an employee rather than an independent contractor (*see id.* at 32–36), and it identifies public policies that his termination allegedly violated, such as the Longshore Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 931(c), state workers' compensation laws, federal and state laws prohibiting perjury, and the American Medical Association's Code of Ethics

for Medical Reporting in Records (*see id.* at 24–27, 30–32).  Plaintiffs admit that the

prima facie tort claim fails under Virginia law (*see id.* at 48 (citing *Meadow Ltd. P'ship*

*v. Heritage Sav. & Loan Ass'n.*, 639 F. Supp. 643, 653–54 (E.D. Va. 1986)), but they

maintain that this claim, and the conspiracy claim, are properly pled under D.C. law

(*see id.* at 46–47).  Similarly, with respect to their contract claims, Plaintiffs assert that

they have stated a claim for breach of the covenant of good faith and fair dealing under

both Virginia law and D.C. law because they have alleged that Torres AES acted in bad

faith in terminating Plaintiffs' contracts.  (*See id.* at 43, 46.)  Finally, Plaintiffs

maintain that their damages for breach of contract, standing alone, are well over the

monetary threshold for federal jurisdiction.  (*See id.* at 23–24.)

After Defendants submitted their reply brief (*see* Reply Br. in Supp. of Defs.'

Mot., ECF No. 29), this Court ordered supplemental briefing on the question of which

law governs each of Plaintiffs' claims—Virginia law or the law of the District of

Columbia.  (*See* Order Requiring Suppl. Briefing ("Suppl. Br. Order"), ECF No. 30, at

3–4.)  This Court also requested supplemental briefing regarding whether the amended

complaint was reasserting Elliott's tort claims, which this Court had previously

dismissed as preempted, and whether venue was proper in this District.  (*See id.*)[5]

In the supplemental filings concerning choice of law, Defendants argue that

Virginia law governs Plaintiffs' contract claims and contract-related tort claims

pursuant to the express choice-of-law provision in the parties' contracts.  (*See* Defs.'

---

[5] As noted above, Plaintiffs have clarified that Elliott is not seeking to reassert any tort claims.  (*See supra* note 3.)  And with respect to venue, based on the parties' responses, this Court finds that while venue may have been improper in the first instance based on the tenuous connections between Plaintiffs' claims and the instant jurisdiction, Defendants have waived any objection to venue by not raising this issue in their first motion to dismiss.  *See* Fed. R. Civ. P. 12(b)(3), 12(h).  In addition, in the absence of a formal motion from Defendants seeking a transfer under 28 U.S.C. § 1404, this Court declines to exercise its discretion to order such a transfer *sua sponte*.

Suppl. Br., ECF No. 32, at 18–23; *see also* Resp. to Pls.' Suppl. Br., ECF No. 35, at 9–10.)  Plaintiffs acknowledge the choice-of-law clause in the contracts, and concede its general validity (*see* Pls.' Suppl. Mem. at 11), but argue that this Court should not enforce that provision on estoppel grounds, because "Defendants failed to assert . . . Virginia as the governing law for over seven years" (*id.* at 13).  Plaintiffs also argue that Sickle's tort claim falls outside the scope of his contract's choice-of-law provision (*see id.* at 14–15), and that this Court should instead apply the law of the District of Columbia (*see id.* at 16–19).

Defendants' motion to dismiss Plaintiffs' second amended complaint for lack of personal jurisdiction and failure to state a claim upon which relief can be granted is now ripe for the Court's review.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Motions To Dismiss For Lack Of Personal Jurisdiction

"Until the court has established personal jurisdiction [over a party], any assertion of judicial power over the party violates due process."  *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982).  To evaluate a contention that this Court lacks personal jurisdiction over a non-resident defendant in a case before it, the Court must analyze whether District of Columbia law permits the exercise of either general jurisdiction or specific jurisdiction over the defendant.  *See United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995); *see also App Dynamic ehf v. Vignisson*, 87 F. Supp. 3d 322, 326 (D.D.C. 2015) (explaining that personal jurisdiction over a non-resident defendant "may take the form of general or specific

jurisdiction"). This evaluation is based primarily on an assessment of the individual

defendant's degree of contact with the District. *See* D.C. Code §§ 13-422, 13-423.

General personal jurisdiction allows a plaintiff to bring any and all legal claims

against the defendant in the District of Columbia courts, *see Williams v. Romarm, SA*,

756 F.3d 777, 783 n.3 (D.C. Cir. 2014), and under D.C. law, general person jurisdiction

is available with respect to any non-resident defendant who maintains "continuous and

systematic contacts within the District of Columbia," *Forras v. Rauf*, 812 F.3d 1102,

1106 n.5 (D.C. Cir. 2016) (internal quotation marks and citation omitted). By contrast,

specific personal jurisdiction—which is governed by the District of Columbia's long

arm statute—"exists where [a particular] claim *arises out of* the non-resident

defendant's contacts with the forum[,]" *see App Dynamic*, 87 F. Supp. 3d at 326

(emphasis added), and then only to the extent that the statute allows, and only if the

exercise of such jurisdiction would not offend due process, *Forras*, 812 F.3d at 1106.

In relevant part, D.C.'s long-arm statute states that

[a] District of Columbia court may exercise personal jurisdiction over
a person, who acts directly or by an agent, as to a claim for relief
arising from the person's –

> (1) transacting any business in the District of Columbia;

> (2) contracting to supply services in the District of Columbia;
> [or] . . .

> (4) causing tortious injury in the District of Columbia by an act
> or omission outside the District of Columbia if he regularly
> does or solicits business, engages in any other persistent course
> of conduct, or derives substantial revenue from goods used or
> consumed, or services rendered, in the District of Columbia.

D.C. Code § 13-423(a). And with respect to the constitutional requirement, an exercise

of personal jurisdiction is ordinarily deemed to satisfy the Constitution's Due Process

Clause if the defendant has sufficient contacts with the forum such that exercising jurisdiction over the defendant would comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985) (explaining that due process requires "minimum contacts"). Notably, D.C. courts have held that there is no additional constitutional due-process hurdle if a plaintiff demonstrates that the defendant meets the "transacting business" test of D.C.'s long arm statute, D.C. Code § 13-423(a)(1). "Thus, a D.C. court need only engage in a single analysis of the defendant's contacts with the District of Columbia under the standards established in the long-arm and service statutes because sufficient contacts under the D.C. Code and proper service is all that Due Process requires." *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 22 (D.D.C. 2014) (citing *Gorman v. Ameritrade Holding Corp*., 293 F.3d 506, 513 (D.C. Cir. 2002); *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329–30 (D.C. 2000)).

A motion to dismiss a lawsuit filed in federal court for lack of personal jurisdiction is properly filed under Federal Rule of Civil Procedure 12(b)(2). *See App Dynamic*, 87 F. Supp. 3d at 326. In the context of such a motion, the plaintiff bears the burden of establishing that the Court's exercise of jurisdiction is proper, *Alkanani*, 976 F. Supp. 2d at 22 (citation omitted), and must do so by, at a minimum, making a prima facie showing of pertinent jurisdictional facts. *See Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). Bare allegations are insufficient. *Id.* Furthermore, when evaluating whether personal jurisdiction exists, the court may consider "materials outside of the pleadings, including declarations[.]" *Alkanani*, 976

F. Supp. 2d at 22.  Similarly, "the Court need not treat all of a plaintiff's allegations as true when making a personal jurisdiction determination[; it] may instead receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts."  *Am. Action Network, Inc. v. Cater Am., LLC*, 983 F. Supp. 2d 112, 118 (D.D.C. 2013) (citation omitted).  However, material disputes concerning the facts in the record must be resolved in favor of the plaintiff.  *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).

> **B.    Motions To Dismiss For Failure To State A Claim Under Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) authorizes a party to move to dismiss a complaint on the grounds that the complaint "fail[s] to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6); *see also Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (explaining that a Rule 12(b)(6) motions tests whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).  The moving party bears the burden of demonstrating that a complaint is legally insufficient, *see Cohen v. Bd. of Trustees of the Univ. of the Dist. of Columbia*, 819 F.3d 476, 481 (D.C. Cir. 2016), and the "court must accept as true all of the allegations contained in a complaint[,]" but this tenet "is inapplicable to legal conclusions[,]" *Harris*, 791 F.3d at 68 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  Moreover, when resolving a motion to dismiss under Rule 12(b)(6), a court is limited to the "four corners of the

complaint, as well as any documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[,]" *Tyson v. Brennan*, 306 F. Supp. 3d 365, 369 (D.D.C. 2017) (internal quotation marks, alteration, and citation omitted), and facts of which the Court may take judicial notice, *Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017), *aff'd*, 894 F.3d 298 (D.C. Cir. 2018).

### C.   Choice Of Law With Respect To Common Law Claims Filed In Federal Court

Finally, it is well established that in diversity cases (such as this one), "the law of the forum state supplies the applicable choice-of-law standard" in the first instance. *Williams v. First Gov't Mortg. & Inv'rs Corp.*, 176 F.3d 497, 499 (D.C. Cir. 1999).  As relevant here, under the District of Columbia's choice-of-law rules, courts enforce express contractual choice-of-law provisions "so long as there is some reasonable relationship with the state specified."  *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394 (D.C. Cir. 1995) (quoting *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)).

Moreover, for the purpose of determining the enforceability of a particular contract's choice-of-law provision, District of Columbia courts routinely find that the state in which the corporate party's headquarters is located is a jurisdiction that qualifies as being reasonably connected to the contract.  *See, e.g.*, *Orchin v. Great-W. Life & Annuity Ins. Co.*, 133 F. Supp. 3d 138, 146–147 (D.D.C. 2015) (enforcing Illinois choice-of-law provision where the corporate defendant was headquartered in Illinois).  Accordingly, courts in the District of Columbia typically enforce contractual choice-of-law provisions that specify that the applicable law is that of the state in which a company has its headquarters.  *See, e.g.*, *Aneke v. Am. Exp. Travel Related Servs.*,

*Inc.*, 841 F. Supp. 2d 368, 375–76 (D.D.C. 2012) (holding that a Utah choice-of-law provision was enforceable where the corporate defendant was based in Utah); *Murphy v. LivingSocial, Inc.*, 931 F. Supp. 2d 21, 25 (D.D.C. 2013) (holding that a District of Columbia choice-of-law provision had a reasonable relationship with the forum where the corporate defendant was headquartered in the District).

## III.   ANALYSIS

As explained above, Defendants have raised threshold arguments regarding personal jurisdiction, and they make various claims about the sufficiency of Plaintiffs' second amended complaint with respect to the contract and tort claims at issue.  This Court finds that it lacks personal jurisdiction over Scott Torres, and it further concludes that most of Plaintiffs' claims are not viable under Virginia law—which applies to the disputes at issue—for the reasons explained below.  The only claim that survives the challenges Defendants make in their motion to dismiss is Plaintiffs' claim for the alleged breach of their express subcontracting agreements with Torres AES; the Court concludes that this claim can proceed because it is sufficiently pled, and because the Court is unable to determine, at this stage of the litigation, that the amounts in controversy with respect to Plaintiffs' claim fall below the threshold for federal jurisdiction.

### A.   **This Court Lacks Personal Jurisdiction Over Scott Torres**

1.   Plaintiffs Have Not Alleged Facts Establishing General Personal Jurisdiction Over Scott Torres

District of Columbia law permits this Court to exercise general personal jurisdiction over any "person who is domiciled in, organized under the laws of, or maintains a principal place of business in the District of Columbia[,]" D.C. Code § 13-

422, or who otherwise "maintains sufficiently systematic and continuous contacts with" the District, such that he is "essentially at home" here. *Duarte v. Nolan*, 190 F. Supp. 3d 8, 12 (D.D.C. 2016) (internal quotation marks and citation omitted). The scope of this mandate makes quick work of the general personal jurisdiction analysis when applied to the circumstances presented here. It is undisputed that Scott Torres has never been domiciled in the District, nor does he himself maintain any place of business in the District of Columbia. (*See* Decl. of Scott Torres ("Torres Decl."). Ex. A to Defs.' Mot., ECF No. 27-2, ¶¶ 2–3, 10.) The second amended complaint is also devoid of any facts that, if true, would establish that that Scott Torres has any "systematic and continuous contacts with" the District of Columbia. *Duarte*, 190 F. Supp. 3d at 12 (D.D.C. 2016).

As such, there are no grounds upon which this Court can exercise general jurisdiction over Scott Torres, and indeed, Plaintiffs appear to concede as much. (*See* Pls.' Opp'n at 15–19 (limiting their argument regarding personal jurisdiction to specific jurisdiction).)

2.   Plaintiffs Have Not Alleged Facts Establishing Specific Jurisdiction Over Scott Torres

As previously indicated, in order for the Court to exercise specific jurisdiction over a non-resident individual defendant such as Scott Torres, Plaintiffs must show "that specific jurisdiction comports with the forum's long-arm statute, D.C. Code § 13-423(a), and does not violate due process." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1094–95 (D.C. Cir. 2008) (citing *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000)). Here, Plaintiffs rely on both the "transacting business" requirement of section 13-423(a)(1) and the "contracting to supply services"

requirement of section 13-423(a)(2).  Plaintiffs' primary argument is that, in his capacity as an agent of Torres AES, Scott Torres does "significant and continuous business" with the United States government in the District of Columbia.  (Pls.' Opp'n at 16; *see also id.* at 17 (asserting that Torres "contracted to supply services in the District of Columbia through supplying individuals who would be Kennel Masters at FOB Shield under a U.S. Government Contract (TWISS) for Security in Iraq"); 2d Am. Compl. ¶ 4 (maintaining that Torres and Torres AES "engaged in negotiations with the United States that had effects or performance occurred in the District of Columbia [and] utilized funds appropriated in the District of Columbia in part for use by Defendants in contracts in Iraq at FOB Shield").)  Plaintiffs further contend that Scott Torres "transacted business" when he claimed that the injury at issue in this case was falsified and "oppos[ed] (at first) the injury and disability claim of Matthew Elliott in the District of Columbia."  (Pls.'s Opp'n at 17.)

Neither of these arguments in support of this Court's authority to exercise specific personal jurisdiction is availing.  To begin with, when considering whether or not the Court has specific personal jurisdiction under the D.C. long arm statute with respect to an employee or officer of a corporation sued in his individual capacity, the Court may only take into account the defendant's "*personal* contacts with the forum and not [his] acts and contacts carried out solely in a corporate capacity."  *Dougherty v. United States*, 156 F. Supp. 3d 222, 229 (D.D.C. 2016) (emphasis added, internal quotation marks, alteration, and citation omitted), *aff'd sub nom. Dougherty v. McKee*, No. 16-5052, 2017 WL 2332591 (D.C. Cir. Feb. 2, 2017); *see also Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 58 (D.D.C. 2005) (noting that

"it is well-settled that this Court cannot assert jurisdiction over an individual defendant based on his actions taken pursuant to his employment"), *aff'd in part and remanded on other grounds sub nom. Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007).  This is known as the "fiduciary shield" doctrine, *Nat'l Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*, 631 F. Supp. 2d 1, 5 (D.D.C. 2009), and courts in the District of Columbia recognize an exception to this doctrine only where "the defendant is found to be 'more than an employee' of the corporation[,]" *id.*  Indeed, this exception applies only to circumstances where the employee is solely responsible for "set[ting] company policies and procedures," was "active in day-to-day operations of the company," and had direct "involvement and supervision of all aspects of the company." *Covington & Burling v. Int'l Marketing & Research, Inc.*, Civ. No. 01–4360, 2003 WL 21384825 at *6 (D.C. Super. 2003); *see also, e.g.*, *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 230–31 (D.D.C. 2007) (holding that Bill and Melinda Gates "cannot be sued in this Court based on their activities within the scope of their employment with the Microsoft Corporation or the Bill & Melinda Gates Foundation because it is well-settled law that a court does not have jurisdiction over individual officers and employees of a corporation solely because the court has jurisdiction over the corporation").  Nothing in Plaintiffs' complaint or any of their other filings establishes that Scott Torres qualifies as "more than an employee" for the purpose of this doctrine, such that the Court can attribute the official business dealings of Torres AES to him personally.

It is also the case that "[t]he District of Columbia Court of Appeals has long interpreted the provision of the D.C. long-arm statute that authorizes jurisdiction over out-of-state defendants who transact any business in the District of Columbia or cause

tortious injury in the District of Columbia to pertain to acts that occur in this forum *other than* those arising out of a defendant's interactions with the federal government." *Globe Metallurgical, Inc. v. Rima Indus. S.A.*, 177 F. Supp. 3d 317, 324 (D.D.C. 2016) (internal quotation marks and alterations omitted).  Under the well-established "government contacts" doctrine, "entry into the District of Columbia by nonresidents for the purpose of contacting federal government agencies is not a basis for the assertion of in personam jurisdiction."  *Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc*., 355 A.2d 808, 813 (D.C.1976).  Moreover, and importantly, "[t]his exception serves at least two purposes: to avoid converting the District of Columbia into a national judicial forum, and to safeguard free public participation in government."  *Globe Metallurgical*, 177 F. Supp. 3d at 324 (internal quotation marks, citations, and alteration omitted).

Plaintiffs' specific personal jurisdiction arguments plainly transgress both the fiduciary shield and the government contacts limitations.  By their own admission, Plaintiffs' argument rests solely on contacts that Scott Torres has had with D.C. in his capacity as an "agent of Torres" (Pls.' Opp'n at 16), which is patently insufficient to support individual personal jurisdiction in light of the fiduciary shield doctrine, *see, e.g.*, *D'Onofrio v. SFX Sports Group, Inc*., 534 F. Supp. 2d 86, 90–91 (D.D.C. 2006); *Wiggins v. Equifax*, 853 F. Supp. 500, 503 (D.D.C. 1994).  And even if Scott Torres qualifies as "more than an employee" of Torres AES, *see Nat'l Cmty. Reinvestment Coal.*, 631 F. Supp. 2d at 5, all of the business activities to which Plaintiffs point involve transacting business and contracting with the U.S. government, which implicates the government contacts exception (*see, e.g.*, Pls.' Opp'n at 16 (relying on

business that Scott Torres and Torres AES "do with the United States government"); *id.* (pointing to "revenue that comes from contacts with the United States government from funds appropriated in the District of Columbia"); *id.* at 17 (claiming that Scott Torres transacted business in D.C. by making representations in the context of federal workers' compensation proceedings).)  Indeed, Plaintiffs have not pointed to single act that Scott Torres has taken in a non-corporate capacity and/or one that is not in some way connected to the federal government, and thus, their attempt to justify this Court's assertion of personal jurisdiction over him under sections 13-423(a)(1) and (a)(2) fails. *See, e.g.*, *Islamic Am. Relief Agency*, 394 F. Supp. 2d at 58 (declining to exercise personal jurisdiction over a non-resident IRS agent based on allegations that agent was "employed and paid by the Department of the Treasury [in the District of Columbia], provides services to the Department of the Treasury at its direction, and is supervised directly or indirectly by officials at the Department of the Treasury)*, aff'd in part and remanded sub nom. on other grounds Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007); *see also Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 50 (D.D.C. 1994) (finding that "[t]he fact that . . . defendants made filings with the FCC and the SEC in the District of Columbia does not, standing alone, provide jurisdiction here" because of the "government contacts exception").

Plaintiffs fare no better with respect to their attempt to invoke section 13-423(a)(4), which permits a court to assert jurisdiction if an individual "caus[es] tortious injury in the District of Columbia by an act or omission outside the District of Columbia[,]" where that individual "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or

consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a).

Plaintiffs' attempt to invoke this section rests on the second amended complaint's

allegation that

> Scott Torres caused tortuous [sic] injury in the District
> through his accusations during the Defense Base Act
> proceeding that Plaintiffs falsified the injury that was the
> basis of the claim under the Defense Base Act, including
> tortuously [sic] retaliating against both Elliott and Sickle
> for Sickle's refusal to recant his report of injury and
> support of Mr. Elliott during the proceeding of the
> Defense Base Act.

(Pls.' Opp'n at 17.)  However, the pleading does not indicate that Scott Torres made

those statements *in his personal capacity*.  And to the extent that he allegedly undertook

these tortious actions as an agent of Torres AES, Plaintiffs have once again failed to

allege facts that are sufficient to establish that personal jurisdiction can be exercised

over him with respect to a tort claim brought against him in his individual capacity.  *See*

*Nat'l Cmty. Reinvestment Coal.*, 631 F. Supp. 2d at 5 (explaining that "personal

jurisdiction over the employees or officers of a corporation in their individual

capacities must be based on their personal contacts with the forum and not their acts

and contacts carried out solely in a corporate capacity") (citation omitted).

Plaintiffs have also failed to plead any facts that establish that Sickle or Elliott

suffered any injury in Washington D.C.; indeed, the operative complaint does not

contain any allegation that either plaintiff has ever been to the District in connection

with the events underlying this lawsuit.  (*See generally* 2d Am. Compl.)  Rather, it

appears that the locus of any alleged injury to them would be Iraq, where the contracts

were slated to be performed, or in Plaintiffs' respective home states of North Carolina

and Wisconsin, where each allegedly was located when he received the e-mail

communication from Scott Torres indicating that his contract was terminated.  (*See id.* ¶¶ 3, 15–16.)  *See also Walton v. Fed. Bureau of Prisons*, 533 F. Supp. 2d 107, 113 (D.D.C. 2008) (finding that plaintiff suffered injuries in jurisdiction where he was located, and not in D.C.).

Finally, Plaintiffs' assertion that the Defendants waived the personal jurisdiction argument by failing to raise that issue before the D.C. Circuit when this matter was on appeal (*see* Pls.' Opp'n at 21) is mistaken.  Defendants raised the personal jurisdiction problem in their initial motion to dismiss (*see* Defs.' Mot. to Dismiss, ECF No. 10, at 16–19), and this Court did not rule on that contention because it opted to dismiss all of Plaintiffs' claims on other grounds, *see Sickle*, 17 F. Supp. 3d at 14 n.1.  What is more, the D.C. Circuit specifically asserted that it was accepting that personal jurisdiction existed over Scott Torres merely "for purposes of [Plaintiffs']" appeal of this Court's order dismissing the complaint.  *Sickle II*, 884 F.3d at 344.  That was by no means a conclusive or binding determination that this Court does, in fact, have personal jurisdiction over Scott Torres.  And for the reasons explained above, the Court concludes that it does not.

### B.  Virginia Law Governs The Amended Complaint's Contract and Tort Claims Against Torres AES, Per The Parties' Contractual Choice-Of-Law Provision

Before the Court addresses the plausibility of the remaining contract and tort claims that Plaintiffs have brought against Torres AES, it must first determine which state's law applies to those claims.  *See Williams*, 176 F.3d at 499 (analyzing whether Maryland or D.C. law applied to the plaintiff's claim).  To make that choice-of-law decision under the circumstances presented here, the Court must determine, as a threshold matter, whether the choice-of-law provision in the written contracts between

Plaintiffs and Torres AES must be honored, and, if so, whether those provisions apply to the claims at issue.

In this regard, it is noteworthy that both Sickle and Elliot entered into subcontract agreements with Torres AES that specifically state that "all matters related to construction, performance and enforcement" of the agreements shall be governed by Virginia law.  (Sickle Contract ¶ 8.5; Elliott Contract ¶ 8.5.)  As a result, Defendants argue that Virginia law applies to the contract and common law claims at issue here (*see* Defs. Suppl. Br. at 18–23), while Plaintiffs maintain that Defendants have waived application of this choice of law provision, and also that Sickle's tort claims fall outside the scope of this provision (*see* Pls.' Suppl. Br. at 14–16).

As explained above in Part II.C, courts in the District of Columbia typically enforce express contractual choice of law provisions "as long as there is some reasonable relationship with the state specified."  *Ekstrom*, 68 F.3d at 1394.  Here, there is no dispute that Torres AES is a Virginia limited liability company that maintains its principal place of business in Falls Church, Virginia.  (*See* 2d Am. Compl. ¶ 3.)  Thus, the requisite reasonable connection exists between the parties' contracts and the chosen state, such that these parties' contractual choice-of-law provisions are enforceable, if applicable.  *See Ekstrom*, 68 F.3d at 1394; *Orchin*, 133 F. Supp. 3d at 146; *Murphy*, 931 F. Supp. 2d at 25; *Aneke*, 841 F. Supp. 2d 368.

Next comes the determination of whether or not the terms of the choice-of-law provision in the contracts between Plaintiffs and Torres AES cover the contract and common law claims pled in the second amended complaint.  This assessment generally turns on the signatories' intentions regarding the governing law, as evidenced by the

contract's language.  *See Azima v. RAK Invest. Auth.*, 926 F.3d 870, 876–79 (D.C. Cir. 2019) (analyzing the language of a contractual forum-selection provision to determine if parties intended it to apply to a particular dispute); *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (evaluating whether the language of a contractual choice-of-law provision is "sufficiently broad to encompass contract-related tort claims"); *Bresler v. Wilmington Tr. Co.*, 348 F. Supp. 3d 473, 488 n.10 (D. Md. 2018) (evaluating the language of choice-of-law provision and finding that it was broad enough to cover contract-related tort claims that the plaintiff pled).  As already noted, each of the choice-of-law provisions at issue here provides that "all matters related to the construction, performance and enforcement" of the agreement "shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia[.]" (Sickle Contract ¶ 8.5; Elliott Contract ¶ 8.5.)  This language is plainly indicative of the parties' intention that Virginia law to be applied to the myriad legal disputes that might subsequently arise from their agreement—for example, the parties agree that Virginia law would apply to all matters "*related to* construction, performance and enforcement" of the contract.  (Sickle Contract ¶ 8.5; Elliott Contract ¶ 8.5 (emphasis added).)  *See also Azima*, 926 F.3d at 877 (noting that the phrase "in relation to" is "quite broad").  Furthermore, the choice-of-law provision in each contract uses *both* "governed by" *and* "construed in accordance with[,]" which extends its applicability even further.  (Sickle Contract ¶ 8.5; Elliott Contract ¶ 8.5.)  *See Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 467 (E.D. Va. 2016) (finding that use of both "governed" and "construed" indicated the parties' intent to create a broad choice of law clause that covered contract-related torts).

"[Tthe fact that the choice-of-law provision is [also] contained in a distinct paragraph titled 'Governing Law,' which also includes the forum-selection clause designating a Virginia federal district court as the proper forum, [further] counsels in favor of a broad interpretation because that combination manifests the intent to reduce uncertainty and proceed in one forum under one body of law."  *Id.* (internal quotation marks, alteration, and citation omitted).  And the parties' clear intent to have such a unitary approach to claims concerning "all matters related to the construction, performance and enforcement" of the agreement between each Plaintiff and Torres AES is especially significant here, because Plaintiffs' tort and contract claims relate to the same contractual duties, and there is no reason to believe that these parties intended the laws of one state would apply to contract claims pertaining to some aspect of the agreement, while the laws of another state would apply to tort claims arising from that same factual predicate.  *See Pyott–Boone Elecs. Inc. v. IRR Trust for Donald L. Fetterolf Dated Dec. 9, 199*7, 918 F. Supp. 2d 532, 544 (E.D. Va. 2013) ("To layer the tort law of one state on the contract law of another state compounds [] complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote." (internal quotation marks and citation omitted)).  For all of these reasons, this Court finds that the parties intended for the choice-of-law provisions in  Plaintiffs' contracts to apply both to the direct contract claims that Sickle and Elliott assert in their amended complaint and also to the tort claims that Sickle has asserted.

Plaintiffs' argument that "enforcement [of the Virginia choice of law provision] would be unreasonable and unjust given the length of time that has passed" (Pls.' Suppl.

Br. at 12) is unpersuasive.  To be sure, this case was initially filed in 2011, but the proceedings concerning this matter are still in their early stages largely due to the D.C. Circuit's lengthy stay of this case while a related appeal was pending.  *See Sickle II*, 884 F.3d at 344 (noting that the Circuit held this case in abeyance pending its decision in *Brink v. Continental Insurance Co.*, 787 F.3d 1120 (D.C. Cir. 2015)).  Unlike in other cases in which courts have weighed heavily such concerns about unfairness, this matter is still at the Rule 12 stage, and discovery has not yet taken place.  *Cf. Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) (finding that the parties waived application of Massachusetts choice-of-law provision when both parties relied on New York law in briefing summary judgment before the district court and on appeal); *Tesla Wall Sys., LLC v. Related Companies, L.P.*, No. 17-cv-5966 (JSR), 2018 WL 4360777, at *3 (S.D.N.Y. Aug. 15, 2018) (holding that plaintiff waived right to assert a choice-of-law provision where it raised the provision "for the first time at a particularly late stage in the case—after the Court has dismissed or issued summary judgment on every other claim, and, even as to the two counts at issue here, after the close of discovery and filing of summary judgment motions").  By contrast, Plaintiffs here simply cannot demonstrate that they have been or will be prejudiced if this Court enforces the contractual choice-of-law provisions at this early stage of the litigation.  Therefore, this Court will apply Virginia law when assessing Plaintiffs' claims under Rule 12(b)(6).

### C.    None Of Sickle's Tort Claims Are Recognized Under Virginia Law

In two of the second amended complaint's counts, Sickle asserts three tort claims against Torres AES: common law retaliatory discharge (Count I), prima facie tort (Count III), and conspiracy (Count III).  This Court finds that Virginia common law

does not recognize any of these tort claims under the circumstances alleged in the second amended complaint, and therefore, these claims must be dismissed.

1.   <u>Plaintiffs Fail To State A Claim For Retaliatory Discharge In Violation Of Public Policy Because Sickle's Termination Does Not Implicate A Specific Virginia Public Policy</u>

The state of Virginia generally adheres to the doctrine of employment at will, which permits an employer "to terminate the employment relationship without the need to articulate a reason[.]" *Johnston v. William E. Wood & Assocs.*, 787 S.E.2d 103, 105 (Va. 2016) (citation omitted).[6]  Nevertheless, Virginia recognizes a "narrow" exception to the employment-at-will doctrine, pursuant to which an employee can maintain a wrongful termination tort claim if the discharge violates the public policy of Virginia. *Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc.*, 796 S.E.2d 188, 190 (Va. 2017); *see also Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985).  Notably, "while all Virginia statutes[] reflect a Virginia public policy to some degree, 'termination of an employee in violation of the policy underlying any one of them does not automatically give rise to a cause of action for wrongful discharge.'" *Anderson v. ITT Indus. Corp.*, 92 F. Supp. 2d 516, 520 (E.D. Va. 2000) (quoting *City of Virginia Beach v. Harris*, 523 S.E.2d 239, 245 (Va. 2000)) (alteration omitted).  Rather, there are only three circumstances where Virginia courts have permitted wrongful discharge claims to proceed under the public policy exception:

(1) When an employer violated a policy enabling the exercise of an employee's statutorily created right . . . ;

---

[6] This Court will assume, for the purpose of resolving the instant motion to dismiss, that Sickle is an employee and not an independent contractor. (*See* Pls.' Opp'n at 32–36 (arguing, based on the facts relating to their working conditions and despite the express language of their contracts to the contrary, that Plaintiffs were employees of Torres AES).)

  (2) When the public policy violated by the employer was
    explicitly expressed in the statute and the employee was
    clearly a member of that class of persons directly entitled
    to the protection enunciated by the public policy . . . ;
    and

  (3) When the discharge was based on the employee's refusal
    to engage in a criminal act.

*Francis*, 796 S.E.2d at 190–91 (internal quotation marks and citations omitted).

   With respect to Sickle's retaliatory discharge claim, this Court is mindful of how the D.C. Circuit characterized this claim during the prior appeal; specifically, the D.C. Circuit determined that "Sickle was not involved in or asked to testify in any matter, let alone in a 'proceeding under [the DBA].'" *Sickle II*, 884 F.3d at 349. "Instead, Sickle was terminated simply because, according to his complaint, he truthfully documented Elliott's medical injuries." *Id.* This means that the Court must now determine whether terminating Sickle's employment because he documented Elliott's injuries falls within one of the three narrow public policy categories that the Virginia Supreme Court has delineated, and the Court finds that it does not, for the following reasons.

   First of all, Sickle has not identified any Virginia statute that vests him with the right to document a co-worker's injuries for the purpose of a federal DBA claim. *Cf., e.g.*, *Bowman*, 331 S.E.2d at 801 (finding that employees who were stockholders in a bank stated a claim for termination in violation of public policy, where the bank terminated the employees for refusing to vote their stock in a particular manner and a statute expressly protected the right of shareholders to vote their shares free from duress from the corporation). Sickle instead relies on Virginia's general perjury and workers' compensation statutes, which do not, in fact, vest him with any specific right to document an injury for purposes of a workers' compensation claim. (*See* 2d Am.

Compl. ¶¶ 20–26; Pls.' Opp'n at 30–32 (citing to Virginia criminal perjury statute and Virginia workers' compensation statute).)  And even assuming that these statutes apply in these circumstances, Plaintiffs have not articulated how Sickle's termination for creating, and then sticking with, his injury report violates any public policy embodied in those statutes. *See Francis*, 796 S.E.2d at 192 (holding that that an employee who was terminated for seeking a protective order against a co-worker failed to state a claim under first public policy exception where she failed to show that "the termination of [her] employment itself violated the stated public policy of protection of health and safety" embodied in Virginia's protective order statute (emphasis omitted)).

Sickle's claim for retaliatory discharge in violation of public policy also fails under the second category of the types of wrongful termination claims that Virginia recognizes—*i.e.*, violation of a public policy that is explicitly stated in a statute where the employee is a member of the class of persons directly entitled to protection.  *See id.* at 191.  Plaintiffs have not identified any Virginia statute that generally protects the rights of medical officers to document workplace injuries or that requires them to do so. *Cf. e.g.*, *Dray v. New Market Poultry Prods., Inc.*, 518 S.E.2d 312, 314 (Va. 1999) (holding that a poultry plant worker who was terminated for reporting unsanitary conditions failed to state a claim for termination in violation of public policy where the Virginia Meat and Poultry Products Inspection Act did not "confer any rights or duties upon her or any other similarly situated employee of the defendant").  And while Sickle attempts to rely on Virginia's worker's compensation statute as the basis for his public policy claim—including a provision that prohibits individuals from making false statements in connection with claims, and another provision prohibiting employer

retaliation against those who make claims or participate in proceedings (*see* Pls.' Opp'n at 31)—Plaintiffs' second amended complaint contains no facts that establish that Elliott was seeking any benefits under this state law scheme, such that Sickle's report would plausibly implicate these prohibitions.  (*See* Pls.' Opp'n at 31 (citing Va. Code §§ 65.2-312, 65.2-308).)

Finally, because there are no facts pertaining to a refusal to engage in a criminal act, the second amended complaint also lacks factual allegations that plausibly relate to the third category of retaliatory discharge in violation of public policy.  *See Francis*, 796 S.E.2d at 191.  Sickle attempts to bring himself within the ambit of this public-policy category by arguing that "[t]he sole reason for the discharge of Plaintiff Sickle was due to his refusal to violate the law, which is a reasonable inference from the attempt to make him recant a medical report under the DBA that he was duty-bound to record accurately according to the precepts of his medical training as well as his job duties."  (Pls.' Opp'n at 24.)  But in reaching its preemption conclusion, the D.C. Circuit determined that Sickle's termination allegedly arose simply and solely from his *documentation* of Elliott's alleged injury, not from his participation in a proceeding under the DBA or his refusal to transgress that statute's precepts.  *See Sickle II*, 884 F.3d at 349–50 (rejecting the contention that "Sickle's filing of a medical report amounts to testimony 'in a proceeding,' for purposes of the [DBA's] retaliation provision[,]" and finding that Sickle "has not participated in" any proceeding under the DBA).  Thus, that holding appears to foreclose any argument that Sickle was terminated for refusing in some way to violate the DBA, or refusing to commit perjury in connection with a DBA proceeding, as would be necessary to trigger the criminal act

public policy exception for the purpose of the retaliatory discharge claim.  (*See* Pls.'
Opp'n at 28 (arguing that Sickle was terminated because of his "refusal to falsify facts
(recant a valid medical report) for a DBA claim"); *id.* at 31 (arguing that Sickle was
terminated for refusing to commit perjury).)

> 2. <u>Plaintiffs Fail To State A Claim For Prima Facie Tort Because
> Virginia Law Does Not Recognize Prima Facie Tort As An
> Independent Cause Of Action</u>

Plaintiffs' prima facie tort claim is also unsustainable under Virginia law.  The
second amended complaint alleges that Torres AES "intentionally inflected harm on
[Sickle] and [his] famil[y], which caused special damages including loss of property,
loss of consortium, loss of savings, loss of income, reputation, and other special
damages" (2d Am. Compl. ¶ 38), and that "[t]his conduct by [Torres AES] was without
justification, which would otherwise be lawful, and constitutes a prima facie tort, and
conspiracy to commit a tort" (*id.*).  But, as Plaintiffs acknowledge, Virginia "has not
recognized prima facie tort as a valid cause of action."  *Unlimited Screw Prod., Inc. v.
Malm*, 781 F. Supp. 1121, 1130 (E.D. Va. 1991) (citation omitted); *Bryant v.
Tomorrow's Res. Unlimited, Inc.*, 68 Va. Cir. 479, 479 (1998) (dismissing a claim for
prima facie tort because there is "no case decided by the Virginia Supreme Court which
supports this broad cause of action").  (*See also* Pls.' Opp'n at 48 (conceding that
"Virginia has not recognized this cause of action" (citing *Meadow Ltd. P'ship*, 639 F.
Supp. at 653)).)

Therefore, Plaintiffs cannot state a claim for relief with respect to this aspect of
Count III.  *See, e.g.*, *Unlimited Screw Prod.*, 781 F. Supp. at 1130–31; *Bryant*, 68 Va.
Cir. at 479.

3.      Plaintiffs Fail To State A Claim For Civil Conspiracy Because The
        Amended Complaint Does Not Allege An Agreement Between
        Defendants And Their Insurer

The only remaining tort claim in the second amended complaint is the allegation

that "Defendants conspired with their insurance carrier, CNA, to commit the aforesaid

acts . . . [which] amount to a civil conspiracy to harm Plaintiffs."  (2d Am. Compl.

¶ 37.)  "To plead a viable claim for civil conspiracy under Virginia law, a plaintiff must

allege sufficient facts to show (1) an agreement between two or more persons (2) to

accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means,

which (3) results in damage to the plaintiff."  *Adkins v. Whole Foods Mkt. Grp., Inc.*,

No. 1:16-cv-00031, 2016 WL 1367170, at *2 (E.D. Va. Apr. 5, 2016).  Put another way,

"Virginia requires a plaintiff to allege some details of time and place and the alleged

effect of the conspiracy[,]" and "[w]here there are only vague, conclusory allegations of

conspiracy, the claim fails at the threshold."  *Beasley v. FV-I, Inc*., No. 1:13-cv-116,

2013 WL 1192018, at *5 (E.D. Va. Mar. 21, 2013) (internal quotation marks and

citations omitted).

Here, Plaintiffs have failed to plead a single fact that, if true, would establish

that Defendants and the insurance company entered into an agreement to harm Sickle.

In fact, the operative complaint contains only fleeting mentions of Defendants'

insurance company at all—first, regarding the denial and later payment of Elliott's

claim for DBA benefits (*see* 2d Am. Compl. ¶ 13), and then concerning Defendants'

alleged representations to the insurer regarding the reason for Elliott's termination (*see*

*id.* ¶¶ 16–17).  The penultimate mention is in Paragraph 37, where Plaintiffs allege that

"Defendants conspired with their insurance carrier, CNA to commit" all of the acts

alleged in the complaint.  (*Id.* ¶ 37.)  These paragraphs are the only mentions of insurer-

related conduct in the second amended complaint, and none of them contains any *allegations of fact* about any agreement between the insurer and Defendants to engage in misconduct directed at Sickle.  *See Bowman*, 331 S.E.2d at 802 (finding that conspiracy claim arising from termination of plaintiffs' employment failed where plaintiff did not allege any facts showing that individuals entered into any agreement to cause the termination of the plaintiffs' employment).

When reviewing such bald civil conspiracy claims, Virginia courts do not hesitate to dispose of such claims on a motion to dismiss.  *See, e.g.*, *Adkins*, 2016 WL 1367170, at *2 (dismissing a conspiracy claim where the plaintiff failed "to allege facts sufficient to raise a plausible inference that two or more employees schemed" to commit a tort against the plaintiff); *Beasley*, 2013 WL 1192018, at *5 (finding that the plaintiff failed to state a claim for civil conspiracy under Virginia law where "[t]he Complaint neither identifies nor details any sort of agreement between FV–I and CitiMortgage, nor does the Complaint describe the manner in which the Defendants colluded"); *see also A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (explaining that "where a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy[, and w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality'" (quoting *Twombly*, 550 U.S. at 556–57)).  That same result is required here.

35

**D.    The Claim Of Breach Of The Covenant Of Good Faith And Fair Dealing Is Not Cognizable In The Employment Context Under Virginia Law; However, Plaintiffs Have Stated A Plausible Claim For Breach Of Contract**

The last set of claims that this Court must address in order to dispose of the pending motion relates to the subcontracting agreements that Plaintiffs have with Torres AES, and Torres AES's duty to proceed in good father under Virginia common law. Plaintiffs claim that Torres AES violated an implied covenant of good faith and fair dealing when it terminated Elliott's contract because he filed a claim for DBA benefits and when it terminated Sickle's contract for truthfully documenting Elliott's injury, and also breached the express notice provisions in Plaintiffs' contracts.  (*See* 2d Am. Compl. ¶¶ 31, 33.)  With respect to the breach of express contract claim, Plaintiffs also argue that they have stated a claim that can proceed in federal court, insofar as the amounts in controversy with respect to any express contract claims are sufficient to support this Court's exercise of diversity jurisdiction over the claims.

As explained below, this Court finds that Plaintiffs' claim for breach of the covenant of good faith and fair dealing fails under Virginia law, but the breach of contract claim can proceed, because Plaintiffs' pleading does not necessarily compel the conclusion that the amounts in controversy with respect to Plaintiffs' breach of contract claims fall below the minimum jurisdictional threshold.

1.    <u>Virginia Courts Do Not Recognize Claims For Breach Of The Covenant Of Good Faith And Fair Dealing In Employment Contracts</u>

Assuming that Sickle and Elliott qualify as employees of Torres AES rather than independent contractors, as Plaintiffs maintain (*see* Pls.' Opp'n at 32–36), the question that must be answered regarding Plaintiffs' claim for breach of the covenant of good

faith and fair dealing is whether Virginia law recognizes such a claim with respect to employment contracts.  A survey of Virginia authorities indicates that Virginia common law does *not* recognize such a claim.

To be sure, the law in Virginia clearly establishes that "every contract contains an implied covenant of good faith and fair dealing," *Enomoto v. Space Adventures, Ltd*., 624 F. Supp. 2d 443, 450 (E.D. Va. 2009), and that a breach of this covenant occurs when a party "exercise[s] contractual discretion in bad faith[,]" *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*., 156 F.3d 535, 542 (4th Cir. 1998) (emphasis omitted).  But, it is also clear that Virginia law "does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing *in employment contracts*[.]"  *Devnew v. Brown & Brown, Inc*., 396 F. Supp. 2d 665, 671 (E.D. Va. 2005) (emphasis added); *see also Chapman v. Asbury Auto. Grp., Inc*., No. 3:15C-cv-679, 2017 WL 3324486, at *5 (E.D. Va. Aug. 3, 2017) (dismissing a claim alleging breach of the covenant because Virginia does not recognize the cause of action in the employment context, and particularly not in the at-will employment context), *appeal dismissed*, 708 F. App'x 134 (4th Cir. 2018).  In fact, a recent opinion from the Eastern District of Virginia underscores the dearth of authority for any such claim in the Commonwealth, by noting that "neither party [in that ligation] can cite to a single case that has found the duty of good faith and fair dealing in any employment context."  *Nisbett v. Reconart, Inc.*, No. 1:16-cv-1467, 2017 WL 1745045, at *5 (E.D. Va. May 3, 2017).

Here, too, Plaintiffs cite to no Virginia case that recognizes this covenant in the context of employment contracts—an omission that Plaintiffs explicitly acknowledge. (*See* Pls.' Suppl. Br. at 17 (noting that "Virginia does not in certain circumstances

[recognize the covenant] in the context of an employment dispute[,]" such that "[i]t is therefore possible Plaintiffs would lose that claim were the Court to . . . apply Virginia law").)  Thus, Plaintiffs have failed to demonstrate the viability of this claim under Virginia law, such that this aspect of Plaintiffs' claims must also be dismissed.  *See, e.g.*, *Chapman*, 2017 WL 3324486, at *5.

> 2.   Plaintiffs Have Stated Claims For Breach Of Contract That Exceed The Federal Jurisdictional Threshold

Finally, with respect to the second amended complaint's contention that Torres AES breached Plaintiffs' respective contracts by terminating their employment without the required notice (*see* 2d Am. Compl. ¶ 31), Torres AES asserts (without citing to any authority) that "losses resulting from the alleged breach are necessarily limited to the amount that Plaintiffs would have earned during the twenty-eight day notice period[,]" which according to Defendants is well under $75,000, measured either collectively or individually (Defs.' Mem. at 33).  The Court cannot accept Defendants' argument for at least two related reasons.

First of all, there is nothing in the contracts that limits Plaintiffs' damages for breach of the 28-day notice period to the amount that Plaintiffs would have earned during that time frame.  Second, and similarly, the legal claim at issue in this case appears to turn on whether Torres AES provided the requisite notice in the proper form prior to Plaintiffs' respective terminations (*see* 2d Am. Compl. ¶ 31; Sickle Contract ¶ 8.2 (requiring that notices under the contract be "in writing and shall be personally delivered, delivered by overnight mail, or mailed, by certified mail-return receipt requested"); Elliott Contract ¶ 8.2 (same)), and it is not at all clear from the terms of the contract or from what is alleged in the complaint *how* damages pertaining to such a

notice violation are to be calculated.  Plaintiffs have plausibly alleged that Torres AES did not provide them with notice of termination in the proper form (*see* 2d Am. Compl. ¶ 15 (alleging that Sickle was terminated by e-mail), ¶ 16 (alleging Elliott was discharged by e-mail)), and Torres AES has cited no authority that establishes that, under Virginia law, damages pertaining to such a breach of contract would be limited in any way, much less limited to the employees' earnings during the notice period (*see* Defs.' Mem. at 33).

Consequently, this Court simply cannot determine, to a legal certainty, that Plaintiffs' claims for damages for breach of contract would necessarily total $75,000 or less under the circumstances alleged in Plaintiffs' second amended complaint.  As a result, it would be improper for the Court to dismiss Plaintiffs' breach of contract claims on this basis at this time.  *See Rosenboro v. Kim*, 994 F.2d 13, 16 (D.C. Cir. 1993) (quoting *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938)).

## IV.   CONCLUSION

For the reasons explained above, this Court finds that it lacks personal jurisdiction over defendant Scott Torres, and thus, all of Plaintiffs' claims against Scott Torres must be dismissed.  This Court further find that Plaintiffs' claims against Torres AES must be construed under Virginia law pursuant to the choice of law provisions in the agreements that the parties entered, and, so construed, Plaintiffs' remaining tort and contract claims—except for their express breach of contract claim—must be dismissed for failure to state a claim upon which relief can be granted.  Consequently, and as set

forth in the accompanying Order, Defendants' motion to dismiss Plaintiffs' second amended complaint is **GRANTED IN PART and DENIED IN PART**.


DATE:  September 14, 2020          *Ketanji Brown Jackson*
                                   KETANJI BROWN JACKSON
                                   United States District Judge